IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

JEFFREY E. WALKER,

    Plaintiff,   No. 2:09-cv-0642 WBS CKD P

vs.

A.H. WHITTEN, et al.,

    Defendants.   FINDINGS AND RECOMMENDATIONS

_____/

    Plaintiff is a California prisoner proceeding pro se with an action for violation of civil rights under 42 U.S.C. § 1983. Defendants Whitten, Greer, Protivinsky and Brewer (defendants) are current or former employees of the California Department of Corrections and Rehabilitation (CDCR) at the California Medical Facility (CMF). Their motion for summary judgment is before the court.[1]

/////

/////

---

[1] Plaintiff filed his opposition to defendants' motion for summary judgment on January 30, 2012 (Dkt. No. 94). After the Ninth Circuit Court of Appeals issued its decision in Woods v. Carey, 684 F.3d 934 (9th Cir. 2012), the court granted plaintiff leave to file an amended opposition. See Dkt. No. 104. Plaintiff did so on January 17, 2013 (Dkt. No. 122) and defendants then filed an amended reply on February 19, 2013 (Dkt. No. 129).

I. Remaining Claims

On August 27, 2009, a magistrate judge previously assigned to this case screened plaintiff's March 18, 2009 amended complaint pursuant to 28 U.S.C. § 1915A. The magistrate judge identified certain claims against the defendants identified above upon which plaintiff could proceed:

> Service is appropriate for the following defendants: Whitten, insofar as the complaint alleges that Whitten retaliated against plaintiff by filing a rules violation report on April 27, 2007, placed plaintiff in a holding cage despite his awareness of the impact of such action on plaintiff's mental health, and conducted searches for purposes of harassment; Greer insofar as it is alleged he searched plaintiff for purposes of harassment and placed plaintiff in a holding cage despite his awareness of plaintiff's mental condition; ... [Protivinsky],[2] insofar as it is alleged he searched plaintiff for purposes of harassment; and Brewer, insofar as it is alleged she was aware [Greer][3] and [Protivinsky] lied about the reasons for the search yet failed to stop the search.

Defendants filed a motion to dismiss on March 25, 2010. Dkt. No. 23. It appears all of the claims described above survived the motion.[4]

II. Summary Judgment Standard

Summary judgment is appropriate when it is demonstrated that there exists "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

> Under summary judgment practice, the moving party
>
> always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the

---

[2] Plaintiff identified defendant Protivinsky as "Privinsky" in his amended complaint.

[3] The previous magistrate judge actually identified defendant Moore here. After reviewing plaintiff's amended complaint it is clear this was a mistake. See Am. Compl. at 11.

[4] The order adopting the findings and recommendations provides that the motion to dismiss was denied "as to claims that defendants Whitten, Greer, Protivinsky, and Brewer conducted or allowed improper searches for the purposes of harassment, retaliation and deliberate indifference to plaintiff's mental health in 2007 and 2008." Dkt. No. 52.

1                 pleadings, depositions, answers to interrogatories, and admissions
                 on file, together with the affidavits, if any," which it believes
2                 demonstrate the absence of a genuine issue of material fact.

3 Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)).  "[W]here the

4 nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary

5 judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers

6 to interrogatories, and admissions on file.'"  Id.  Indeed, summary judgment should be entered,

7 after adequate time for discovery and upon motion, against a party who fails to make a showing

8 sufficient to establish the existence of an element essential to that party's case, and on which that

9 party will bear the burden of proof at trial.  See id. at 322.  "[A] complete failure of proof

10 concerning an essential element of the nonmoving party's case necessarily renders all other facts

11 immaterial."  Id.  In such a circumstance, summary judgment should be granted, "so long as

12 whatever is before the district court demonstrates that the standard for entry of summary

13 judgment, as set forth in Rule 56(c), is satisfied."  Id. at 323.

14         If the moving party meets its initial responsibility, the burden then shifts to the

15 opposing party to establish that a genuine issue as to any material fact actually does exist.  See

16 Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  In attempting to

17 establish the existence of this factual dispute, the opposing party may not rely upon the

18 allegations or denials of its pleadings but is required to tender evidence of specific facts in the

19 form of affidavits, and/or admissible discovery material, in support of its contention that the

20 dispute exists.  See Fed. R. Civ. P. 56(e); Matsushita, 475 U.S. at 586 n.11.  The opposing party

21 must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome

22 of the suit under the governing law, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248

23 (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir.

24 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could

25 return a verdict for the nonmoving party, see Wool v. Tandem Computers, Inc., 818 F.2d 1433,

26 1436 (9th Cir. 1987).

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." T.W. Elec. Serv., 809 F.2d at 631. Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963 amendments).

In resolving the summary judgment motion, the court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any. Fed. R. Civ. P. 56(c). The evidence of the opposing party is to be believed. See Anderson, 477 U.S. at 255. All reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party. See Matsushita, 475 U.S. at 587. Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. See Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir. 1987). Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Matsushita, 475 U.S. at 587 (citation omitted).

III. Analysis

    A. Whitten Retaliated By Filing A "Rules Violation Report" on April 27, 2007

In his amended complaint, which is signed under the penalty of perjury, plaintiff alleges as follows:[5]

\\\\\

---

[5] Transcriptions from plaintiff's amended complaint are verbatim except the court has corrected some obvious punctuation and spelling errors.

> On 4-27-07, it was alleged by officer A.H. Whitten that Plaintiff had violated a rule violation 3005 (b) conduct which could lead to violence for failing to obey a direct order to stop.
>
> This RVR was done in prejudice after Plaintiff who has been a victim of unwarranted touching had reacted when seeing A.H. Whitten and Unit I Officer searching inmates, where plaintiff made a comment A.H. Whitten did not like and that was it looked like sexual harassment.
>
> So on 4-27-07, in retaliation this RVR was written to harass plaintiff and to intimidate. This same officer had also started to search Plaintiff and was so upset that plaintiff did not obey an order he came to the unit L-1 from several units away and started yelling at Plaintiff in front of others done to humiliate, cause defamation of character as if he was a trouble maker and then took plaintiff in handcuffs to a holding cage at the program office for punishment when there was a written policy that the cages are not to be used for such acts.
>
> This officer A.H. Whitten was also told that Plaintiff was a mental health patient and was not be placed in a cage because of a past incident where he was assaulted by staff and almost killed in a cage in 1995 at Corcoran SHU and if placed it would cause a mental health reaction and it did. Plaintiff freaked out and plaintiff's primary clinician had to be called and plaintiff was taken to for help. . .

Am. Compl. at 3.

The Rules Violation Report (RVR) issued by defendant Whitten indicates that on April 27, 2007, while escorting another inmate in mechanical restraints, Whitten saw plaintiff walking in front of him. Whitten yelled "escort" to plaintiff which caused plaintiff to go against a wall, but he continued to walk. When Whitten saw that plaintiff did not stop, Whitten again yelled "escort" in an attempt to get plaintiff to stop walking. At some point, plaintiff stopped. Whitten attempted to counsel plaintiff concerning the prison's escorting policy. During the counseling, plaintiff became upset and started yelling. Whitten then placed plaintiff on the wall and conducted a "clothed body search." During the search, plaintiff became more agitated. In response to this, plaintiff was placed in mechanical restraints and placed in a holding cell. January 30, 2012 Opp'n to Mot. for Summ. J., Ex. B at 10.

\\\\\

In his declaration submitted with defendants' motion for summary judgment, defendant Whitten specifically asserts the RVR he issued on April 27, 2007 was not retaliatory, it was issued because plaintiff failed to follows orders. He also indicates that it is the policy at CMF that during escorts of restrained inmates, CMF staff will announce "Escort!" in a loud voice which directs all inmates in proximity to the escorted inmate to stand facing a wall with their hands behind their backs until the escort has passed. The purpose of this, according to Whitten, is to ensure the safety of the inmate being escorted and the inmates in the vicinity of the escort.

Prison officials cannot retaliate against inmates for exercising First Amendment rights. Rizzo v. Dawson, 778 F.2d 527, 531 (9th Cir. 1985). Retaliation in this context is adverse action taken against an inmate because of conduct by the inmate which is protected by the First Amendment. Rhodes v. Robinson, 408 F.3d 559, 567 (9th Cir. 2005). In order to survive a motion for summary judgment with respect to a First Amendment retaliation claim, plaintiff must point to evidence establishing a nexus between the retaliatory act and the protected activity. See Huskey v. City of San Jose, 204 F.3d 893, 899 (9th Cir. 2000). Furthermore, Something more than minimal harm must have resulted from the retaliation. Rhodes, 408 F.3d at 568 n. 11. A chilling effect on the exercise of a plaintiff's First Amendment rights is sufficient harm. Id. at 567-68.

Putting aside the question of whether plaintiff's statement that a search conducted by defendant Whitten amounted to "sexual harassment" was protected under the First Amendment, plaintiff does not point to any evidence demonstrating any nexus between his statement and the issuance of the RVR by Whitten on April 27, 2007. Plaintiff fails to indicate when he made the statement or any other evidence suggesting Whitten took enough offense at the statement to initiate disciplinary proceedings against plaintiff on April 27, 2007. Furthermore, plaintiff suffered no injury as a result of the issuance of the RVR, because the charges were ultimately dismissed. See March 25, 2010 Mot. to Dismiss, Decl. of D. Lewis; Ex. B. at 6-7.

For these reasons, defendant Whitten should be granted summary judgment as to plaintiff's claim that the RVR issued on April 27, 2007 was done in retaliation for plaintiff's exercise of his First Amendment rights.

B. Whitten's Placement Of Plaintiff In A Holding Cage

As indicated above, plaintiff takes issue with defendant Whitten's placement of plaintiff in a holding cage after he was searched on April 27, 2007. He asserts he suffered mentally by being placed in the holding cage, and defendant placed him in the cage despite knowing that plaintiff would suffer. In his declaration, defendant Whitten describes the events occurring after plaintiff was searched on April 27, 2007 as follows:

> 7. I escorted plaintiff to the program office and placed him in a holding cell on one occasion after he became belligerent following my giving him the aforementioned RVR.
>
> 8. A holding cell is an enclosed structure that the inmate is temporarily placed in and has similar dimensions to a telephone booth.
>
> 9. As far as I know, Plaintiff never had a chrono (an authorization or directive, generally from medical or [psychiatric] personnel) that precluded him from being placed in a holding cell. I was never informed by correctional, medical or psychiatric staff that plaintiff could not be placed in a holding cell.
>
> 10. At all relevant times in the complaint, I had no knowledge of any medical or psychological condition that would have precluded the placement of Plaintiff in a holding cell. And in any event, without a chrono that had been approved by custody supervisors, I was obligated [to] utilize the holding cell whenever it was warranted by Plaintiff's behavior.
>
> 11. When an inmate commits a rules violation, depending on the inmate's attitude and body language at the time, custody staff have authority to place the inmate in a holding cell briefly until the matter can be resolved.
>
> 12. After placing an inmate in a holding cell, correctional staff members are to immediately contact the supervisor of the unit where the inmate is housed. The supervisor will come down and get the inmate and normally return him to his housing unit. After plaintiff was placed in the holding cell, I immediately contacted Plaintiff's housing unit supervisor to come and take him back to his housing unit.

> 13. I was following policy and procedure in placing Plaintiff in a holding cell because Plaintiff was refusing a direct order and I observed him become belligerent. I did not place Plaintiff in a holding cell to harass him or to retaliate against him for any reason.
>
> 14. No supervisor ever informed me that I was never to place Plaintiff in a holding cell.

In plaintiff's declaration attached to his supplemental opposition to defendants' motion for summary judgment, plaintiff indicates he was in the holding cell described above for 15 minutes before he was released to a staff member from plaintiff's housing unit. Dkt. No. 122 at 33.[6]

The Eighth Amendment's prohibition on cruel and unusual punishment imposes on prison officials, among other things, a duty to "take reasonable measures to guarantee the safety of the inmates." Farmer v. Brennan, 511 U.S. 825, 832 (1991) (quoting Hudson v. Palmer, 468 U.S. 517, 526-27 (1984)). An inmate's Eighth Amendment rights are violated by a prison official if that official exposes an inmate to a "substantial risk of serious harm," while displaying "deliberate indifference" to that risk. Id. at 834.

Defendants assert the defense of "qualified immunity" with respect to all of plaintiff's remaining claims. Pursuant to the qualified immunity defense, government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). In determining whether a governmental officer is immune from suit based on the doctrine of qualified immunity, the court must answer two questions. The first is whether the officer's conduct violated a constitutional right. Saucier v. Katz, 533 U.S. 194, 201 (2001). The second is "whether the right was clearly established," id., and it is plaintiff's burden to show that it was,

---

[6] The page number identified is the one assigned by the court's electronic docketing system.

Alston v. Reed, 663 F.3d 1094, 1098 (9th Cir. 2011). A negative answer to either question means immunity from suit is appropriate. Pearson v. Callahan, 555 U.S. 223, 236 (2009).

A review of relevant case law reveals that it is not clearly established that a correctional officer can be held liable for a violation of the Eighth Amendment by placing a person who is already a prisoner in a holding cage the size of a telephone booth for 15 minutes despite the fact that the inmate has communicated that placement in the cell will cause him mental suffering. Defendant Whitten is therefore entitled to immunity with respect to plaintiff's claim concerning Whitten's placing plaintiff in a holding cage.

    C.   Greer's Placement Of Plaintiff In A Holding Cage

In his amended complaint, plaintiff alleges on July 3, 2008, plaintiff was stopped by defendant Greer and Officer Moore.[7] Moore searched plaintiff which upset plaintiff to the point that he called Greer and Moore "homosexuals" and had a "mental breakdown." Greer yelled at plaintiff, called him names, and eventually put him in handcuffs.

Greer then placed plaintiff in a holding cage. Plaintiff asserts as follows as to his mental condition at the time he was placed in the holding cage by Greer:[8]

> [I]t was already known plaintiff was not to be placed [in a holding cage] due to trauma and a mental health patient and where a policy was made not to place inmates in there.

Am. Complt. at 10.

In plaintiff's declaration attached to his supplemental opposition to defendants' motion for summary judgment, plaintiff indicates he informed Greer that he could not be placed in a holding cage for mental health reasons. Plaintiff told Greer to check with plaintiff's "clinician," whom plaintiff believed was in his office. Greer ignored plaintiff and placed him in the holding cage. While in the cage, plaintiff was "freaking out," "yelling," "screaming" and

---

[7] Officer Moore was dismissed as a defendant in this action on April 18, 2011.

[8] Again, transcriptions from plaintiff's amended complaint are verbatim except the court has corrected some obvious punctuation and spelling errors.

9

kicking the cage door. Lt. Pulsipher "took over" after plaintiff was placed in the holding cage and eventually released plaintiff. Dkt. No. 94-2 at 95 & 122 at 39-41.[9]

At his deposition, plaintiff indicated he does not remember how long he was in the holding cage because he "freaked out." Plaintiff was specifically asked whether he was in the cage for five minutes or an hour and plaintiff reiterated he was not sure. Dep. Tran. at 202:3-12.

In his declaration, defendant Greer indicates he recalls the incident involving plaintiff in July of 2008 and that plaintiff was placed in a holding cage after he shouted "homosexuals" in response to a "clothed body search." Greer does not recall whether he was the officer who placed plaintiff in the holding cage, however. At the time of the incident, defendant Greer was not aware that plaintiff had obtained a "chrono" precluding plaintiff's being placed in a holding cell. Greer reiterates that it was normal policy at CMF that if an inmate created a disturbance, they would be placed in a holding cell until an officer from their housing unit could collect them.

As with defendant Whitten, defendant Greer is entitled to immunity with respect to plaintiff's claim concerning Greer's placement of plaintiff in a holding cage. The only material fact before the court which is different with respect to plaintiff's claim against defendant Greer is plaintiff does not indicate how long he was in the holding cage when Greer placed him there. When plaintiff was asked how long he was in the cage, plaintiff asserted he could not remember whether he was in the cage for a short period of time (5 minutes) or a long period (an hour). The court finds this answer evasive especially in light of the fact that there is nothing before the court suggesting any mental illness plaintiff might have effects his memory. In any case, at this stage, it is plaintiff's burden to place facts before the court upon which a finding of a violation of the Eighth Amendment could be made. Plaintiff's failure to put before the court any facts suggesting plaintiff was in the holding cage for a long enough period of time to amount to a

---

[9] The page numbers identified here are the ones assigned by the court's electronic docketing system.

violation of a clearly established right arising under the Eighth Amendment entitles defendant Greer to summary judgment.

### D.  Searches

#### 1.  Plaintiff's Allegations

Plaintiff is proceeding on claims that defendants Whitten, Greer and Protivinsky all conducted searches of plaintiff's person in order to harass him.  Also, plaintiff claims defendant Brewer permitted defendants Greer and Protivinsky to search plaintiff knowing it was their motive to harass him.  In his amended complaint, plaintiff makes the following allegations related to plaintiff's claims regarding harassing searches:

1.  Plaintiff asserts that he is a "mental health patient" who suffers when he is touched as a result of some unarticulated trauma related to "unwarranted touching."  Plaintiff was subjected to a number of searches he deems objectionable.  The searches are identified by defendants as "clothed body searches" and essentially are the same as a police officer's "pat down" search.  Generally speaking, during these searches, plaintiff was ordered to face a wall, place his hands on the wall and then spread his legs.  Then, an officer, while standing behind plaintiff with one leg between plaintiff's legs, searched all of plaintiff's clothing including the clothing around plaintiff's groin, buttocks and thighs.

2.  The first search occurred on April 27, 2007 as described above.  Also, as described above, defendant Whitten issued a Rules Violation Report (RVR) that same day in which it was alleged that plaintiff had disobeyed a direct order.  Plaintiff was found guilty of the RVR, but that finding was later overturned after it was determined on appeal that plaintiff was in poor health at the RVR hearing, and the original hearing officer did not explain why plaintiff was found guilty of "disobeying orders" when plaintiff was actually charged with "conduct which could lead to violence."  January 30, 2012 Opp'n to Mot. for Summ. J; Ex. B. at 1-2.[10]  A second

---

[10] The court takes judicial notice of this fact because it is not subject to reasonable dispute and can be accurately and readily determined from sources whose accuracy cannot

11

hearing on the RVR was held on October 29, 2007. In his complaint, plaintiff alleges he was found not guilty as the reviewing officer found that plaintiff was suffering from mania during the confrontation with Whitten. However, this is not true. A review of the report of the hearing officer indicates plaintiff was found guilty of disobeying a direct order, but the charges were dismissed because the hearing on the charges was not held in a timely manner. March 25, 2010 Mot. to Dismiss, Decl. of D. Lewis; Ex. B. at 6-7.[11]

   3. Within fourteen days from October 29, 2007, Whitten and his supervisor stopped and searched plaintiff in the manner described above three times. Plaintiff asserts Whitten conducted these searches because he found out plaintiff was found not guilty of the charges identified in the RVR drafted by Whitten, although plaintiff fails to indicate how Whitten found out. He also alleges Whitten was aware that searching plaintiff caused plaintiff mental distress, but fails to point to anything which reasonably suggests as much.

   4. Plaintiff filed a "citizens complaint" against Whitten on November 13, 2007 asking that Whitten stop searching plaintiff. See January 30, 2012 Opp'n to Mot. for Summ. J; Ex. F. During an interview concerning the "complaint," Whitten agreed that he would "leave plaintiff alone" and plaintiff withdrew his "citizens complaint."

   5. On or about July 1, 2008 as he was coming back from breakfast, plaintiff witnessed defendant Whitten stopping and searching inmates. When he returned to his housing unit, plaintiff mumbled something to himself and was visibly upset. Officer Smith saw that plaintiff was upset by the searches and told plaintiff "Oh, I know you like that Walker." Plaintiff informed Smith that he "wrote up" Whitten for doing that to him. Smith relayed what plaintiff had told him to Whitten and, in response, Whitten appeared at plaintiff's cell. Whitten was upset about what plaintiff had told Smith. He had denied that plaintiff ever "wrote him up" and then

---

reasonably be questioned. See Fed. R. Evid. 201(a) & (b)(2).

 [11] See note 10.

told him to "get [his] pen out" because the searches were going to start again. In response, plaintiff informed defendant he would file another complaint against Whitten and initiate a lawsuit. Whitten laughed and said "go ahead."

6. On July 2, 2008, plaintiff was stopped and searched by two officers including defendant Greer in the manner described above. The same officers did the same thing on July 3, 2008. This time plaintiff yelled "homosexuals" during the search. In response, defendant Greer yelled at plaintiff and placed him in handcuffs.

7. On his way back from breakfast on July 5, 2008, another inmate told plaintiff defendants Greer and Protivinsky were waiting for him. Plaintiff hid in the infirmary and asked to speak to defendant Lt. Brewer. Plaintiff informed defendant Brewer about his aversion to being searched by Greer and Protivinsky. Pursuant to plaintiff's request, Brewer escorted plaintiff back to his cell. However, at some point, Brewer let Greer and Protivinsky search plaintiff. Greer and Protivinsky told Brewer they wanted to search plaintiff because he was "hanging out" in the hallways where they were. According to plaintiff, Brewer knew that to be untrue. Plaintiff asserts Greer and Protivinsky were aware of mental trauma caused to plaintiff by his being searched, but he does not describe how they knew that other then to indicate he told Greer and Protivinsky as much.

8. Plaintiff asserts he was searched ten times within fourteen days of July 1, 2008. The magistrate judge who screened plaintiff's amended complaint found that plaintiff could proceed on claims that searches conducted by defendants Whitten, Greer and Protivinsky were conducted to harass plaintiff. However, plaintiff does not have a Constitutional right to be free of harassing searches. Considering the facts alleged, it is possible the magistrate judge found that the facts alleged by plaintiff concerning the searches amounted to viable claims under the First, Fourth and Eighth Amendments. The court assumes that is the case and analyzes whether summary judgment should be granted to defendants on claims arising under those amendments.

\\\\\

### 2. Fourth Amendment

Generally speaking, the Fourth Amendment prohibits searches of persons that are unreasonable. But, whether the Fourth Amendment even applies to a particular person in a particular situation depends on whether the person invoking protection under the Fourth Amendment can claim a reasonable expectation of privacy that has been invaded by government actions. Hudson v. Palmer, 468 U.S. 517, 525 (1984).

Neither the Supreme Court, nor the Ninth Circuit have ever held that prisoners have a reasonable expectation of privacy in being free from "clothed-body" "pat-down" searches by correctional officers of the same sex. In Hudson, the Supreme Court held that prisoners do not have a reasonable expectation of privacy as to the contents of their cells. Id. at 526-530. The court made the following noteworthy comment in support of this conclusion:

> Notwithstanding our caution in approaching claims that the Fourth Amendment is inapplicable in a given context, we hold that society is not prepared to recognize as legitimate any subjective expectation of privacy that a prisoner might have in his prison cell and that, accordingly, the Fourth Amendment proscription against unreasonable searches does not apply within the confines of the prison cell.

Id. at 525-26.

From Hudson, it is clear that whatever expectation of privacy plaintiff might have as to searches of his person while in prison does not arise from the nature of the items plaintiff might carry with him. The Supreme Court has understandably found that problems such as violence, security, drugs and good hygiene require that prison officials have constant and unfettered access to all tangible items in the possession of prisoners. Id. at 526-27. What is less clear is the level of personal intrusion with respect to prisoners via, among other things, touching of the body, is required to trigger Fourth Amendment protection. In the most closely analogous case, the Ninth Circuit has suggested that male prison inmates do have some Fourth Amendment protection with respect to "clothed body" "pat-down" searches of the groin conducted by members of the opposite sex. Grummet v. Rushen, 779 F.2d 491, 496 (9th Cir. 1985).

When prisoners do have Fourth Amendment protection, the court analyzes the reasonableness of the search challenged by considering the following factors:  (1) the scope of the intrusion; (2) the manner in which the search was conducted; (3) the justification for the search; and (4) the place where the search was conducted.  Byrd v. Maricopa County Sheriff's Dept., 629 F.3d 1135, 1141 (9th Cir. 2011).

In his declaration, defendant Whitten provided the following information about the searches at issue in this case, and the need for searches in general inside a state prison:

1. While assigned to the Unit 1 corridor, Whitten regularly conducted "clothed-body" searches on passing inmates.  In his experience, inmates are more likely to have dangerous contraband in such areas as to other parts of the prison.  Defendant was instructed by his superiors to conduct as many searches as he could.  Also, CDCR regulations require random "clothed-body" searches for contraband.  Pursuant to CDCR regulations, officers should also conduct searches when an inmate's conduct is suspicious.  During such searches, inmates have been found to be carrying, among other things, weapons and drugs.  The searches were undertaken to ensure safety and security.

2. Plaintiff often passed through the Unit 1 corridor to get to the mess hall and to the infirmary, so he was frequently subjected to search as with other inmates.

3. Defendant Whitten knew of no medical condition exempting plaintiff from being searched.  Plaintiff never showed defendant Whitten an authorization or directive from medical professionals, which CDCR employees refer to as "chronos," stating that he could not be subjected to "clothed-body" searches and Whitten had never heard of any inmate possessing such a "chrono."  Whitten did not perform any searches to harass or retaliate against plaintiff.

4. Whitten was trained to conduct clothed-body searches in the following manner: he would order the inmate to turn around and put their hands on a wall, he would put one of his legs between their legs down toward the ankle (to keep the inmate from turning around and attacking him), and then pat the inmate's shoulders, arms, chest, back, groin, buttocks, legs and

to feel for contraband.  In Whitten's experience, most inmates hide contraband in their waistband and groin area.  Also, CDCR regulations require that during searches officers must pat down the groin and buttocks.  Failure to do so could subject a correctional officer to discipline if, for example, contraband is later found.

In their declarations defendants Greer and Protivinsky provide essentially the same information as Whitten regarding the need for frequent and random searches, their obligation under CDCR rules to conduct them, and how the searches are conducted.

At his deposition, plaintiff admitted that he had been subjected to searches in the in the Unit 1 corridor by officers other than defendant prior to April 27, 2007.  Dep. Tran. at 78-79.  There is nothing before the court indicating that, besides the search conducted by defendant Whitten on April 27, 2007, plaintiff was the specific target of the searches conducted.  In other words, there is nothing before the court suggesting the purpose behind the searches conducted was to search only plaintiff, but was rather to search all inmates in the area where the officers were stationed.

While the court does not hold that prisoners have no Fourth Amendment protection from "clothed-body" "pat-down" searches conducted by correctional officers of the same sex while inside prison, there is not much protection.  The court could envision a circumstance where it is obvious that a plaintiff is not carrying any contraband.  For example, if after a thorough search, a prisoner takes a few steps and then is ordered to submit to a search again, it is at least possible that such a search would be unreasonable under the Fourth Amendment.  However, being searched every day or even more than that in prison is not unreasonable considering the inherent potential for violence, escape and other illegal activity.  It would not be unreasonable to search a plaintiff every time he leaves his cell because correctional officers cannot maintain eye contact with a prisoner the whole time he is in his cell.  It would not be unreasonable to search an inmate every time he leaves a dining hall because of the ability to obtain weapon making material there.  It would not be unreasonable to search an inmate every

time he comes back from visiting with a non-prisoner.

In this instance, the court does not find that any search to which plaintiff was subjected was unreasonable considering the minimal intrusion of the search, and the fact that plaintiff is in prison where random and unannounced searches are essential to safety and security. Nothing suggests that during any of the searches described, it was clear that the search served no legitimate purpose. Finally, it is worth noting that, no matter plaintiff's mental condition, he cannot escape being searched while in prison. While the court reiterates plaintiff has not lost all of his Fourth Amendment rights while in prison, plaintiff fails to articulate how his person may be searched without causing him some mental trauma or, put another way, explain why the searches conducted by the defendants in this case deviate in any way from searches of prisoners that are entirely appropriate and necessary.

For all of these reasons, defendants Whitten, Greer and Protivinsky should be granted summary judgment as to any Fourth Amendment claims which may arise from the searches conducted by them of plaintiff's person described in plaintiff's amended complaint.

3. First Amendment

Prison officials generally cannot retaliate against inmates for exercising First Amendment rights. Rizzo, 778 F.2d at 531. A prisoner suing prison officials under § 1983 for retaliation must show that he was retaliated against for exercising his Constitutional rights and that the retaliatory action does not advance legitimate penological goals, such as preserving institutional order and discipline. Bruce v. Ylst, 351 F.3d 1283, 1288 (9th Cir. 2003). The plaintiff bears the burden of pleading and proving the absence of legitimate correctional goals for the conduct of which he complains. Pratt v. Rowland, 65 F.3d 802, 806 (9th Cir. 1995).

Plaintiff asserts that the searches at issue were conducted in retaliation for: 1) plaintiff indicating that a search conducted by defendant Whitten upon other inmates amounted to "sexual harassment;" 2) the charges identified in the RVR issued by defendant Whitten against plaintiff on April 7, 2007 being dismissed; and 3) comments made to Officer Smith indicating

plaintiff had filed grievances against defendant Whitten in the past for searching Smith.

As indicated above, plaintiff has not presented evidence demonstrating the searches at issue did not advance the legitimate correctional goals of maintaining the safety of everyone inside CMF and the security of the institution. Defendants are accordingly entitled to summary judgment with respect to any claim that they searched plaintiff in retaliation for his exercise of protected First Amendment rights.

4. Eighth Amendment

The Eighth Amendment prohibits cruel and unusual punishment against prisoners. This prohibition against cruel and unusual punishment has been held to, among other things, require that prison staff not be deliberately indifferent to serious medical needs of prisoners, e.g. Estelle v. Gamble, 429 U.S. 97, 104-06(1976); that prison staff protect inmates from exposure to substantial risks of serious harm by not being deliberately indifferent to such risks, e.g. Farmer, 511 U.S. at 834; and by not using excessive force against inmates, e.g. Whitley v. Albers, 475 U.S. 312, 319 (1986).

Here, none of plaintiff's remaining claims concern denial of medical attention. As for those remaining defendants plaintiff claims searched him for the purpose of harassment, plaintiff's right to be free of excessive force is at least implicated. However, plaintiff fails to state a claim for Eighth Amendment excessive force because any force used against plaintiff in any of the searches at issue was de minimis and an Eighth Amendment claim cannot be predicated on a use of de minimis force. See e.g. O'Malley v. Litscher, 465 F.3d 799, 805 (7th Cir. 2006) (nurse's three attempts to insert intravenous feeding line found to be use of de minimis force which could not be the predicate of an Eighth Amendment claim).

Plaintiff asserts defendant Brewer failed to stop the search described above conducted by defendants Greer and Protivinsky. Again, the Eighth Amendment's prohibition against cruel and unusual punishment imposes on prison officials a duty to take reasonable measures to guarantee the safety of the inmates, Farmer, 511 U.S. at 832, and an inmate's Eighth

...

Amendment rights are violated by a prison official if that official exposes an inmate to a "substantial risk of serious harm," while displaying "deliberate indifference" to that risk. Id. at 832.

By allowing Greer and Protivinsky to conduct a brief "clothed-body" "pat-down" search of plaintiff, defendant Brewer did not violate plaintiff's Eighth Amendment rights. Even if she had some reason to believe plaintiff would suffer mentally to some degree due to the search, nothing suggests she had any reason to believe she would be subjecting plaintiff to a "substantial risk of serious harm." Furthermore, the fact that plaintiff did not want to be searched certainly could have caused her to believe that plaintiff was carrying contraband, rendering the search entirely appropriate. In fact, both defendants Greer and Protivinsky indicate in their declarations that plaintiff's evasive behavior gave them more cause to search.

Also, defendant Brewer is immune from suit under the "qualified immunity" doctrine[12] because there is no clearly established law indicating that her permitting other officers to search a prisoner who had been evasive amounts to a violation of the Eighth Amendment simply because the prisoner indicated he would suffer mental trauma as a result of the search.

For all of these reasons, defendants Whitten, Greer, Protivinsky and Brewer should be granted summary judgment with respect to any Eighth Amendment claims arising from searches of plaintiff's person conducted or approved by them described in plaintiff's amended complaint.

IV. Conclusion

For all of the foregoing reasons, the court will recommend that defendants' motion for summary judgment be granted and this case be dismissed. The court notes that plaintiff has recently filed a motion for injunctive relief concerning his current conditions of confinement. Because the court is recommending that defendants' motion for summary

---

[12] See pages 8-9.

judgment be granted and this case be closed, there is no basis for granting preliminary injunctive relief upon plaintiff's remaining claims.  To the extent plaintiff seeks entry of an order related simply to the litigation of this matter, the court finds it is not warranted.

In accordance with the above, IT IS HEREBY RECOMMENDED that:

1. Defendants' November 18, 2011 motion for summary judgment (Dkt. No. 74) be granted;

2. Plaintiff's February 5, 2013 motion for an "injunction" or "temporary restraining order" (Dkt. No. 127) be denied; and

3. This case be closed.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections shall be served and filed within fourteen days after service of the objections.  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

Dated: March 11, 2013

_____
CAROLYN K. DELANEY
UNITED STATES MAGISTRATE JUDGE

---

1
walk0642.57